UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIAM HOLBROOK, personal
representative of the Estate of Wanda
Holbrook,

    Plaintiff,

v.

PRODOMAX AUTOMATION LTD., et al.,

    Defendants.
_____/

Case No. 1:17-cv-219

Hon. Hala Y. Jarbou

## **OPINION**

There are seven pending motions in this case. Today the Court resolves four of them: (1) Defendant Prodomax Automation Ltd.'s motion for judgment on the pleadings (ECF No. 174); (2) Plaintiff William Holbrook's motion for partial summary judgment (ECF No. 183); (3) Prodomax's motion for summary judgment (ECF No. 260); and (4) Defendant Flex-N-Gate, LLC's motion for summary judgment (ECF No. 304)[1]. William's motion will be denied. Flex-N-Gate's motion will be granted. Prodomax's motion for judgment on the pleadings will be converted to a motion for summary judgment and granted. Prodomax's second motion for summary judgment will be denied.

## **I. JURISDICTION**

William Holbrook brings this action as the personal representative of the estate of his deceased wife, Wanda Holbrook. The operative claim asserts eleven claims, all based in Michigan law, against six defendants. (First Am. Compl., ECF No. 43.) Federal courts may only exercise jurisdiction over actions based in state law when no plaintiff is a citizen of the same state as any

---

[1] Flex-N-Gate originally filed its motion at ECF No. 266 but filed a corrected version at ECF No. 304. The Court will cite the corrected version.

defendant and the amount in controversy exceeds $75,000.  28 U.S.C. § 1332(a).  Because only two defendants remain, the Court will only examine whether William has citizenship different from Prodomax and Flex-N-Gate.  *See Prime Rate Premium Fin. Corp., Inc. v. Larson*, 930 F.3d 759, 766 (6th Cir. 2019) (diversity jurisdiction is not defeated by a non-diverse party who is later dismissed, thereby curing jurisdictional defect) (citing *Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 572-73 (2004)).

"[T]he legal representative of the estate of a decedent shall be deemed to be a citizen only of the same State as the decedent."  28 U.S.C. § 1332(c)(2).  Wanda was domiciled in Michigan; William, as the Personal Representative of Wanda, is treated as a Michigan citizen.  (First Am. Compl. ¶ 1.)  As a LLC, Flex-N-Gate shares citizenship with its members.  *V & M Star, LP v. Centimark Corp.*, 596 F.3d 354, 356 (6th Cir. 2010).  Flex-N-Gate has three members, each of them trusts, that are citizens of Illinois and Florida.  (ECF No. 329 ¶ 1.)  Thus, Flex-N-Gate is a citizen of Illinois and Florida.  As a corporation, Prodomax is a citizen of its place of incorporation and wherever it maintains its principal place of business.  28 U.S.C. § 1332(c)(1).  Prodomax is incorporated in Canada and has its principal place of business in Ontario.  (ECF No. 329 ¶ 2.)

From the above, the Court concludes that there is complete diversity between the parties in this case.  Since this lawsuit concerns the allegedly wrongful death of Wanda Holbrook, the Court is also satisfied that, as William alleges, the amount in controversy exceeds $75,000.  The Court has jurisdiction over this action.

## II. BACKGROUND

Wanda Holbrook was a journeyman maintenance technician at Ventra Ionia Main, LLC, an affiliate of Flex-N-Gate.  Ford Motor Company contracted Flex-N-Gate to supply trailer hitch receiver assemblies for Ford's F-150 pickup trucks.  (Wiegand Dep. 21-23, ECF No. 214-1.)  These hitch assemblies would be manufactured at Ventra Ionia's facility.  Flex-N-Gate contracted with

Prodomax to design, build, and install automated assembly lines at Ventra Ionia that would manufacture the trailer hitch receiver assemblies. (Purchase Orders, ECF Nos. 214-5, 214-6.) Flex-N-Gate purchased a series of robots from FANUC.[2] Those robots would do the actual manufacturing; it was Prodomax's job to make automated assembly lines out of them. (Wiegand Dep. 35.)

This case concerns one of the assembly lines called the 100 line. Once installed, the 100 line consisted of six enclosed zones separated by retractable walls known as "Vertiguard" walls. (Schreiber Decl. ¶¶ 5, 8, ECF No. 214-2.) In each zone, a robot would perform some function towards making a trailer hitch receiver. (*Id.* ¶ 6.) So, for example, "[t]he [zone] 130 robot places the hitch assemblies in the two fixtures in the 140 section for those robots to weld . . . . Then the [zone] 150 robot removes the welded hitch assemblies from the fixtures" and brings them to zone 150 for cooling. (MIOSHA Report, Field Narrative, ECF No. 184-1.) During active production, the Vertiguard walls are partially lowered to permit transfer of parts between zones. (Schreiber Decl. ¶ 8.)

When operating in full swing, the robots are fast and dangerous. But sometimes maintenance issues require a human worker to enter a zone—each accessible by at least one door. In such cases, the person must press a "request to enter button" outside the door of the zone they seek to enter and wait for a signal light to change from red to green. (Herblet Dep. 52-54, ECF No. 214-12.) Pressing the button causes the robots in the zone to stop operating and raises the Vertiguard walls, ensuring that the zone being entered is closed off from all other zones, which remain in operation. The green light indicates that the zone is safe to enter. Once the door is open,

---

[2] FANUC Corporation (a Japanese entity) and FANUC America Corporation were both Defendants in this case until they were dismissed by stipulation in June 2021. (ECF No. 228.)

3

it is important—and mandatory—to follow a "lockout/tagout" (LOTO) procedure by placing a tagged safety lock on the door to prevent it from closing. (LOTO Procedure, ECF No. 214-14.) Robots in the zone will not resume automatic operation while the zone door remains open. (Schreiber Dep. 105-06, ECF No. 210-11.) Robots in adjacent zones are also prevented from entering the occupied zone. (*Id.*)

For unknown reasons, Wanda did not follow the appropriate procedures on July 7, 2015. The parties agree on the likeliest course of events. A robot in zone 150 reached over the lowered Vertiguard wall into zone 140 to pick up a welded hitch assembly from where it rested in a fixture. (*See* Wiegand Dep. 94.) But the hitch was misaligned in the fixture and the zone 150 robot could not extract it. (*See id.*) The 150 robot "faulted over": unable to grab the hitch, it lay stretched across the lowered Vertiguard wall between zones 140 and 150.

The parties agree that Wanda would have diagnosed this "pick fault" when she entered zone 150. To address the issue, Wanda would have to enter zone 140 with the 150 robot's "teach pendant," essentially a wired control panel, to manually guide the 150 robot. According to safety procedures, Wanda should have left zone 150 through the door she entered, gone to the zone 140 door, and pressed the "request to enter" button to power down zone 140 and enter through there. Instead, she climbed over the lowered Vertiguard wall between zones 150 and 140. (Accident Investigation Report 10, ECF No. 214-13.) Because she simply climbed over the lowered Vertiguard into zone 140: (1) zone 140 was still powered, and (2) the Vertiguard separating zones 130 and 140 did not rise, meaning 130 robots could still enter zone 140.[3]

---

[3] The Vertiguard separating zones 140 and 150 did not rise when Wanda powered down zone 150 because the 150 robot was faulted over the Vertiguard.

As mentioned, zone 140 has fixtures. Robots in zone 130 place hitch assemblies in those fixtures, and then robots in 140 weld them together. Zone 140 is also equipped with sensors to detect the presence of hitch assemblies. The 130 robots will not attempt to place hitch assemblies in the fixtures unless the sensors detect empty fixtures. These sensors are incredibly sensitive; a shift in the part of four millimeters, even a part simply "rocking . . . back and forth" would indicate that a fixture with a hitch assembly was free to receive a new part. (Schreiber Dep. 142-43.) It is not clear exactly what happened, but it appears that, after Wanda moved the 150 robot out of the way, the 140 sensors falsely detected empty fixtures. A robot from 130 entered 140 to insert a new hitch assembly into a fixture. The 130 robot crushed Wanda's head and pinned her between the hitch assembly that was already in place. (MIOSHA Report, Field Narrative.) 140 robots then attempted to weld the new hitch assembly, severely burning Wanda's "face, nose, and mouth[.]" (Todd Report Addendum, ECF No. 214, PageID.2748-2749.)

A coworker discovered Wanda's body shortly after the incident. First responders pronounced her dead. Within hours of the incident, the 100 line was reprogrammed such that the entire line would power down anytime someone opened a single zone door. (ECF No. 184-7.) The present lawsuit followed.

### III. STANDARDS

#### A. Summary Judgment

Summary judgment is appropriate when the moving party demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Courts must examine the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," to determine whether there is a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P 56(c)) (internal quotations omitted).

5

A fact is material if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A material fact is genuinely disputed when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249 (citing *First Nat'l Bank. of Ariz. v. City Serv. Co.*, 391 U.S. 253, 288-89 (1961)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party [by a preponderance of the evidence], there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *City Serv.*, 391 U.S. at 289).

In considering the facts, the Court must draw all inferences in the light most favorable to the nonmoving party. *Id.*  Summary judgment is not an opportunity for the Court to resolve factual disputes. *Anderson*, 477 U.S. at 249.

## IV. ANALYSIS

There are two key disputes behind the motions the Court now addresses: (1) whether William can maintain a claim of common law negligence against Defendants; and (2) whether Wanda's failure to follow employer-mandated safety protocols defeats William's various product liability claims against Prodomax.  Sitting in diversity, the Court must apply Michigan law to resolve these issues. *Himmel v. Ford Motor Co.*, 342 F.3d 593, 598 (6th Cir. 2003).  Also covered by several motions is whether Flex-N-Gate qualifies as a manufacturer or a non-manufacturing seller.  The parties now agree that Flex-N-Gate is neither and thus the product liability claims against it must be dismissed.

### A. Conversion to Summary Judgment

Prodomax's motion for judgment on the pleadings seeks dismissal of William's common law negligence claim.  Responding, William cites exhibits attached to his own motion for partial summary judgment and invites the Court to convert Prodomax's motion to a motion for summary judgment.  Conversion of a Rule 12(c) motion is governed by Rule 12(d), and here it is appropriate

6

to do so. William has presented matters outside the pleadings. In its reply brief, Prodomax incorporated its arguments in its then-forthcoming response to William's own motion for summary judgment, which turns on the same issues raised in the motion for judgment on the pleadings. Thus, both parties had "a reasonable opportunity to present all the material that is pertinent to the" 12(c) motion. Fed. R. Civ. P. 12(d). The Court will convert Prodomax's 12(c) motion to a motion for summary judgment.

### B. William's Common Law Negligence Claim

William asserts a common law negligence claim against both Prodomax and Flex-N-Gate. The claim is based on the way the assembly line was programmed through what is called a programmable logic controller (PLC). A PLC is basically a computer. The PLC here instructed the 100 line robots on how to move and when, among other things. PLC programming also determined how zones and robots responded to open zone doors. Before Wanda's death, a zone door opening would only cause that specific zone to power down and raise the Vertiguard walls to prevent robots in other zones from entering. After she died, the PLC was reprogrammed so that every zone would power down when a single door was opened.[4] William argues that the PLC should have always been programmed this way, and that Defendants were negligent in programming zone-specific shutdowns.

In Prodomax's now-converted motion for summary judgment and in Flex-N-Gate's motion for summary judgment, both parties argue that William cannot assert a common law negligence claim because the PLC programming should be considered a product under the Michigan Product

---

[4] From reviewing the revised schematic (ECF No. 184-7), it appears that it would be more accurate to say that several distinct zones were reprogrammed to be treated as a single zone with many possible entrances. It is not clear if the reprogramming truly made the entire 100 line a single zone or if it instead made most zones into a single zone. Either way, the zones at issue here—130, 140, and 150—were all rolled up into a single zone and in the context of this case, it is clearer and more economical to say that the 100 line was reprogrammed to shut down entirely when any zone door was opened.

Liability Statute (MPLS), Mich. Comp. Laws § 600.2945 et seq., and because the MPLS provides the sole remedy available for product liability claims. William counters that PLC programming is not a product and hence not subject to the MPLS. Therefore, in his motion for partial summary judgment he asks the Court to rule that the damages cap set forth in the MPLS does not apply to his negligence claim. The Court finds that the PLC programming issue is governed by the MPLS and cannot proceed as a common law negligence claim. The Court will therefore grant Prodomax's converted motion for summary judgment, grant Flex-N-Gate's motion for summary judgment, and deny William's motion for partial summary judgment.

### 1. The MPLS does not permit the common law negligence claim

The MPLS defines "[p]roduct liability action" as "an action based on a legal or equitable theory brought for the death of a person . . . caused by or resulting from the production of a product." Mich. Comp. Laws § 600.2945(h).

As Prodomax and Flex-N-Gate both argue, if a plaintiff brings "an action based on a legal or equitable theory . . . for the death of a person . . . caused by or resulting from the production of a product," then the MPLS precludes other claims based on the same facts. The Michigan Court of Appeals has affirmed this principal on several occasions. In *Heaton v. Benton Constr. Co.*, 780 N.W.2d 618 (Mich. Ct. App. 2009), the court ruled that the plaintiff's claim, pled as one of negligence, fell within the MPLS's ambit because it was based on "'a legal . . . theory of liability brought for . . . damage to property.'" *Id.* at 623 (quoting Mich. Comp. Laws § 600.2945(h)); *see also Johnson v. Jenkins*, No. 334452, 2017 WL 4699753, at *3 (Mich. Ct. App. Oct. 19, 2017) ("Although [the plaintiff] may allege negligence as part of his product liability action, such assertion serves as a theory of liability, rather than a separate claim."). Thus, William's PLC programming claim is governed by the MPLS if it is based on a legal theory brought for Wanda's death that was caused by the "production of a product."

8

Now the Court must examine the meanings of "production" and "product." "Production" is defined as the "manufacture, construction, design, formulation, development of standards, preparation, processing, assembly, inspection, testing, listing, certifying, warning, instructing, marketing, selling, advertising, packaging, or labeling" of a product. Mich. Comp. Laws § 600.2945(i). William's claim is subject to the MPLS if the PLC programming is either a product or if it is somehow part of the production of a product.

### (a) The PLC programming is a "product"

In applying state law, the Court is bound by any relevant decisions of the Michigan Supreme Court. *Bank of N.Y. v. Janowick*, 470 F.3d 264, 272 (6th Cir. 2006). The Michigan Supreme Court has not addressed whether software such as PLC programming should be considered a product. Where there is no direct "guidance on the issue at hand," the Court "may consider the decisions of the State's courts of appeals, relevant dicta from the [Michigan] Supreme Court, as well as other sources such as 'restatements of law, law-review commentaries, and the rules adopted by other jurisdictions.'" *Croce v. N.Y. Times Co.*, 930 F.3d 787, 792 (6th Cir. 2019) (quoting *Mazur v. Young*, 507 F.3d 1013, 1016-17 (6th Cir. 2007)). Unfortunately, there are no on-point decisions from Michigan's lower courts, either. Thus, the Court must anticipate how Michigan courts would answer this question and adhere to that anticipated answer. *Mazur*, 507 F.3d at 1016.

As always, the Court starts with the text of the statute it must interpret. The MPLS offers a recursive definition of "product": "'Product' includes any and all component parts to a product." Mich. Comp. Laws § 600.2945(g). In interpreting this statute, the Court's "primary goal is to ascertain the legislative intent that may reasonably be inferred from the words in [the] statute." *Iliades v. Dieffenbacher N. Am. Inc.*, 915 N.W.2d 338, 343 (Mich. 2018) (citation and internal quotation marks omitted). To effectuate this goal, the Court "must construe statutory language

9

according to the common and approved usage of the language." *Fenton Area Pub. Schs. v. Sorensen-Gross Constr. Co.*, 355 N.W.2d 211, 224 (Mich. Ct. App. 1983) (internal quotation marks omitted). "A resort to dictionary definitions is an appropriate method of achieving this result." *Id.* Because the language in question was adopted as part of amendments passed in 1995, 1995 Mich. Pub. Acts 98, the Court will examine definitions contemporaneous with the amendment.

The sixth edition of Black's Law Dictionary, published in 1990, defines "product," in pertinent part, as "[g]oods produced or manufactured, either by natural means, by hand, or with tools, machinery, chemicals or the like," and as "[s]omething produced by physical labor or intellectual effort[.]" It does not define "component," but defines "part" as "[a]n integral portion, something essentially belonging to a larger whole; that which together with another makes up a whole." *Part*, Black's Law Dictionary (6th ed. 1990). The relevant definition of "product" from the Oxford English Dictionary is "[t]hat which is produced by any action, operation, or work; a production; the result." *Product*, Oxford English Dictionary (2d ed. 1989). It defines "component" as a "constituent element or part" and "part" as a "[p]ortion or division of a whole" and "[t]hat which together with another or others makes up a whole . . . any one of the smaller things into which a thing is or may be divided[.]" *Component*, *Part*, Oxford English Dictionary (2d ed. 1989).

Perhaps, as Prodomax argues, the PLC programming is a product because it was produced by "intellectual effort." Flex-N-Gate convincingly argues that an assembly line such as the 100 line is a product. In *Gautheir v. Mayo*, 258 N.W.2d 748, 749 (Mich. Ct. App. 1977), the Michigan Court of Appeals held that a "defective" and "uninhabitable" modular home could be subject to a product liability action. If a "modular home," presumably made up of many component parts,

10

constitutes a product, then an assembly line should as well. And if the 100 line is itself a product, then, as Prodomax further argues, the PLC programming is surely a component part of that product. The PLC programming is an "integral" and "essential" part of the 100 line because, as William puts it, "without . . . the PLC program . . . the robotic components would not have been orchestrated to move at all within the line." (Pl.'s Reply to Flex-N-Gate in Supp. of Pl.'s Mot. for Summ. J. 5, ECF No. 234.)

Since the PLC programming is either a product itself or a component of the 100 line, also a product, the PLC programming constitutes a product under the MPLS. *See* 4 *Business Torts* § 35.06 (Joseph D. Zamore ed. 2010) ("If damages result to person or other property, the resulting lawsuit will concern the tangible product which incorporates the computer and its software."). "Production" includes design. Because the PLC could have been programmed in multiple different ways, including to treat all relevant zones as a single zone, the Court agrees with Defendants that William is fundamentally challenging the design of a product. Therefore, he could only prosecute the PLC programming's purportedly defective design through a product liability claim; he cannot assert a claim for common law negligence here.

### (b) The PLC program is a design feature of a product

Flex-N-Gate offers another credible argument for why the MPLS governs here. First, it correctly asserts that the 100 line is a product. Next, it claims that the PLC programming is part of the 100 line's design. The difference here is that the PLC programming need not qualify as a product itself. If it is part of the 100 line's design, then William is still bringing an action based on a legal theory concerning the death of Wanda as the result of the production (design) of a product (the 100 line). The Court agrees that the PLC programming is a design of the 100 line.

William argues that the programming cannot possibly be part of the design because the 100 line was not programmed until it was completely installed at the Ventra Ionia facility. That does

11

not defeat Flex-N-Gate's argument, though. As William acknowledges, the PLC programming determines how the 100 line functions *as an assembly line*: it tells the many robots when to act, or not, and, crucially, it determines how much of the 100 line would remain in operation while portions of the line were under maintenance. The PLC programming determines how the 100 line functions; that falls squarely within "design." That the programming was completed at the facility does not make it any less a part of the product's design.

### (c) Unsuccessful counterarguments

William makes a number of unsuccessful counterarguments. First, he encourages the Court to use a definition of "product" set forth in the Third Restatement of Torts. The Third Restatement says that

> (a) A product is tangible personal property distributed commercially for use or consumption. Other items, such as real property and electricity, are products when the context of their distribution and use is sufficiently analogous to the distribution and use of tangible personal property that is appropriate to apply the rules stated in this Restatement.
>
> (b) Services, even when provided commercially, are not products.
>
> (c) Human blood and human tissue, even when provided commercially, are not subject to the rules of this Restatement.

Restatement (Third) of Torts § 19. William also refers to several comments to § 19 that he says supports his contention that PLC programming is not a product.

The Court does not believe that it can rely on the Third Restatement to the degree advocated by William. First, the Court was unable to locate any case in which a Michigan court, or a federal court applying Michigan law, relied on the § 19 definition. Moreover, the "any and all component parts" language shows that the MPLS defines product more broadly than the Third Restatement does, and the Third Restatement offers no guidance on what the Court should make of that additional language. The § 19 definition of "product" does not win the day here.

William also offers the definition of "product" from the most recent edition of Black's Law Dictionary, which is limited to "tangible personal property" and does not mention any results of intellectual labor. *Product*, Black's Law Dictionary (11th ed. 2019). But the Michigan legislature defined "product" in 1995—there is no way it could have relied on a definition from 2019. That is why the Court looked to a Black's Law edition that was contemporaneous with the legislation in question.

William further invites the Court to "draw an analogy between the treatment of software under the Uniform Commercial Code and these circumstances in order to determine whether the PLC program should be considered a 'product' under the [MPLS]." (Pl.'s Reply to Prodomax in Supp. of Pl.'s Mot. for Summ. J. 7, ECF No. 230 (emphasis deleted and internal quotation marks omitted).) Under the UCC, software's status as a good can depend on whether the parties contracted for the provision of services rather than true goods. William argues that Prodomax fundamentally provided a service in creating and programming an assembly line for Flex-N-Gate and that the PLC programming should therefore fall outside the MPLS's definition of product. But even if programming the PLC could be considered a service rather than a good, the ultra-broad definition of "production" in the MPLS means that the heavy bulk of Prodomax's work in making the 100 line would qualify as the provision of goods rather than services. This argument fails.

Finally, William contends that Defendants mis-rely on a case that actually supports his argument that the MPLS does not preclude a common law negligence claim here. He notes that in *Wendorf v. JLG Industries*, 683 F. Supp. 2d 537, 539-40 (E.D. Mich. 2010), the court did not expressly hold that the plaintiff was limited to a product liability action rather than a negligence claim. In fact, William points out, the court permitted the plaintiff to *add* a claim of gross negligence. *Id.* at 549. However, gross negligence is not an independent claim. Gross negligence

is a means of getting around the product liability damages cap that is the subject of William's motion for summary judgment. "The limitation on damages . . . does not apply to a defendant if the trier of fact determines . . . that the death or loss was the result of the defendant's gross negligence." Mich. Comp. Laws § 600.2946a(3). The *Wendorf* decision is entirely consistent with the principal that the MPLS limits the actions available to plaintiffs.

In sum, the Court will grant Prodomax's converted motion for summary judgment and Flex-N-Gate's motion for summary judgment on this issue. The Court will also deny William's motion for partial summary judgment. William cannot proceed with his common law negligence claim and the MPLS damages cap applies.

### C. Remainder of Flex-N-Gate's Motion for Summary Judgment

In addition to the negligence claim, Flex-N-Gate seeks summary judgment on the four product liability claims it faces. William and Flex-N-Gate agree that the company does not qualify as a manufacturer or non-manufacturing seller under the MPLS. Therefore, Flex-N-Gate cannot be subject to any product liability claims.[5] The remainder of Flex-N-Gate's motion for summary judgment will be granted.

### D. Prodomax's Motion for Summary Judgment

Prodomax filed a separate motion for summary judgment (ECF No. 260) seeking to dismiss the four product liability claims against it. Prodomax says it is shielded from liability by the product misuse defense afforded to manufacturers in Mich. Comp. Laws § 600.2947(2). This motion will be denied.

Section 600.2947(2) states that "[a] manufacturer or seller is not liable in a product liability action for harm caused by misuse of a product unless the misuse was reasonably foreseeable.

---

[5] Indeed, in a proposed amended complaint currently pending before the Court, Williams drops his product liability claims against Flex-N-Gate. (*See* ECF No. 202-1.)

Whether there was a misuse of a product and whether misuse was reasonably foreseeable are legal issues to be resolved by the Court." William does not contest that Wanda committed misuse when she climbed a wall into zone 140 instead of following mandated safety protocols. The question is whether it was reasonably foreseeable to Prodomax that she would do so.

Under Michigan law, "foreseeability depends on whether a reasonable person could anticipate that a given event might occur under certain conditions." *Iliades*, 915 N.W.2d at 340. Regarding misuse of a product, "the crucial inquiry is whether, at the time the product was manufactured, the manufacturer was aware, or should have been aware, of that misuse." *Id.* "Whether a manufacturer should have known of a particular misuse may depend on whether that misuse was a common practice, or if foreseeability was inherent in the product." *Id.* at 344.

Wanda's particular misuse—climbing over the lowered Vertiguard wall separating zone 140 from 150—was foreseeable because Prodomax in fact foresaw it. Prodomax's Engineering Manager, Bill Richardson, explained that the Vertiguards' purpose, even when lowered, was to "prevent a person from" going between zones in the exact way that Wanda did. (Richardson Dep. 132, ECF No. 261-3.) In zone 150, moreover, there is a raised platform right in front of the Vertiguard wall. (Todd Dep. 104-05 ECF No. 261-12.) When lowered, the Vertiguard in zone 150 stands just 37 inches above the platform. (*Id.*) The misuse at issue was foreseen by Prodomax.

Prodomax makes a number of unsuccessful arguments to the contrary. First, it argues that it intended Ventra Ionia employees to follow safety protocols and use the assembly line in a safe manner. Most manufacturers do. Just because Prodomax intended workers to use the assembly line safely does not mean that it did not foresee otherwise. Next, Prodomax argues it had no notice of misuse because it had not received any reports of wall-climbing before Wanda's death. This argument fails because Prodomax anticipated improper wall-climbing and took measures, mainly

15

through installing Vertiguard walls, to make such misuse more difficult to achieve. Prodomax further contends that Wanda's misuse was unforeseeable because no one could have reasonably expected her to do something so dangerous. Again, that contention is belied by the very measures Prodomax took to prevent wall-climbing. It also claims that Wanda's misuse was unreasonable. That is not the inquiry. The question is whether her misuse was foreseen or reasonably foreseeable by Prodomax.

Finally, Prodomax says that "it is utterly impossible for Prodomax to design out, or absolutely guard against, a user determined to defeat or evade provided safety devices and procedures[.]" (Prodomax's Br. in Supp. of Mot. for Summ. J. 26, ECF No. 261 (emphasis deleted).) That may be true, but that relates to a different defense offered by the MPLS, one that is unasserted in Prodomax's motion for summary judgment. "A manufacturer . . . is not liable in a product liability action if the alleged harm was caused by an inherent characteristic of the product that cannot be eliminated without substantially compromising the product's usefulness or desirability[.]" Mich. Comp. Laws § 600.2947(5).

Some products are inherently dangerous and subject to misuse in a variety of foreseeable ways. Chainsaws, for example, are dangerous and easy to misuse. But it might be difficult to redesign a chainsaw to absolutely prevent potential misuses without defeating the purpose of the chainsaw in the first place. Perhaps the 100 line was as safe as could be reasonably expected. That does not mean, however, that dangerous misuses were not foreseeable. Because Prodomax foresaw Ventra Ionia employees climbing over walls separating zones in the 100 line, the Court will deny Prodomax's motion for summary judgment on the product liability claims against it.

## V. CONCLUSION

For the above reasons, William's motion for partial summary judgment (ECF No. 183) will be denied. Flex-N-Gate's motion for summary judgment (ECF No. 304) will be granted.

Flex-N-Gate will be dismissed as a defendant. Prodomax's motion for judgment on the pleadings, converted to a motion for summary judgment (ECF No. 174), will be granted; its separate motion for summary judgment asserting the unforeseeable misuse defense (ECF No. 260) will be denied. The Court believes that the resolution of these four motions may impact the resolution of the three motions still pending. The Court will seek from the parties on how, if at all, the motion for leave to file an amended complaint (ECF No. 202) and the cross-motions for summary judgment on Flex-N-Gate's crossclaim (ECF Nos. 256, 305) are affected. An order will enter consistent with this opinion.

Dated:   September 20, 2021                    /s/ Hala Y. Jarbou
                                                HALA Y. JARBOU
                                                UNITED STATES DISTRICT JUDGE